# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MEDIGUS LTD., <br><br>     Plaintiff/Counterclaim Defendant, <br><br>   v. <br><br> ENDOCHOICE, INC., <br><br>     Defendant/Counterclaimant. | C.A. No. 15-505-LPS-CJB |

### ENDOCHOICE'S JULY 7, 2016 DISCOVERY LETTER BRIEF

Dated: July 7, 2016

FISH & RICHARDSON, P.C.
Susan Morrison Coletti (# 4690)
Martina Tyreus Hufnal (# 4771)
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
hufnal@fr.com; coletti@fr.com

Frank E. Scherkenbach
One Marina Park Drive
Boston, MA 02210-1878
Telephone: (617) 542-5070
scherkenbach@fr.com

Todd G. Miller
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
miller@fr.com

Corrin Drakulich
1180 Peachtree Street, NE, 21st Floor
Atlanta, GA 30309
Telephone: (404) 892-5005
drakulich@fr.com

**ATTORNEYS FOR DEFENDANT/COUNTERCLAIMANT ENDOCHOICE, INC.**



Fish & Richardson P.C.
222 Delaware Avenue
17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114

302 652 5070 main
302 652 0607 fax

July 7, 2016

**BY CM/ECF FILING**

The Honorable Christopher J. Burke
United States District Court for the District of Delaware
844 North King Street
Wilmington, DE  19801-3555

Re:     *Medigus Ltd. v. EndoChoice, Inc.*
        C.A. No. 15-505-LPS-CJB

Dear Judge Burke:

EndoChoice writes to seek the Court's assistance with two discovery issues the parties have been unable to informally resolve.  We address these in turn.

**Medigus Refuses to Provide Responses to Requests for Admission Nos. 12-17 and Interrogatory No. 5**

EndoChoice seeks substantive responses to its Request for Admission Nos. 12-17 and Interrogatory No. 5.  [Exs. 1, 2]  The requests for admission ask Medigus to admit whether the post-issuance changes made to a single claim limitation in its asserted U.S. Patent No. 6,997,871 (the "'871 Patent") changed, enlarged, broadened or expanded the scope of asserted claim 1.  Medigus has refused to respond to these requests contending, incorrectly, that they "improperly seek[] a legal conclusion and as premature discovery of experts."

By way of background, seven years after the '871 patent issued, Medigus obtained a Certificate of Correction ("CoC") of asserted claim 1.  Medigus' filing of the CoC coincided with the successful commercial release by EndoChoice of its Fuse® endoscope.  The "correction" changed the original claim limitation "a single continuous shaft including, a sheath, an articulation section attached to a distal end of said **sheath** and, a distal tip attached to a distal end of said articulation section" to "a single continuous shaft including, a sheath, an articulation section attached to a distal end of said **shaft** and, a distal tip attached to a distal end of said articulation section."  [Ex. 3 ('871 Patent) at Col. 15, line 1.]  The change from "sheath" to "shaft" in this limitation impacts the scope of the limitations in claim 1 that include either "shaft" or "sheath".  [*See, e.g.* Ex. 3 ('871 Patent) at Col. 14, line 66 ("a single continuous shaft"); *id*. at Col. 14, line 67 ("a sheath"); *id*. at Col. 14, line 67-Col. 15, line 1 ("an articulation section attached to a distal end of said ~~sheath~~ shaft"); *id*. at Col. 15, line 12 ("said second location located either on a proximal end of said articulation section or on the sheath of said endoscope")].

The validity of Medigus' CoC has, from the outset of this case, been a central disputed issue.  To determine Medigus' position on the impact of the "correction," EndoChoice propounded the requests



for admission. Medigus' position on this issue is necessary not only to focus the claim construction briefing, but also to direct discovery related to Medigus' infringement positions and EndoChoice's defenses and counterclaims. While it should be beyond dispute that the scope of the asserted claims was changed by the CoC because the words "sheath" and "shaft" refer to different components of the claimed endoscope, Medigus refuses to reveal its position. Medigus apparently favors leaving the scope of its asserted claims ambiguous for as long as possible, including through the claim construction process. That approach exemplifies the "shifting sands" approach to patent litigation that the Scheduling Order seeks to preclude.

With regard to the claim construction process, the briefing schedule provides for simultaneous opening and responsive briefing and specifically excludes reply briefs without leave of the Court. Without knowing Medigus' definitive position on the impact of the CoC on the scope of the asserted claims, EndoChoice will be left to guess at what that position is in its opening claim construction brief due on August 15. If, as expected, Medigus does not provide pre- and post-CoC constructions for the impacted terms in its opening brief, the first time they will address the issue is in their responsive brief (if then). Consequently, EndoChoice may be deprived of the opportunity to respond to whatever position Medigus ultimately decides to take. If, on the other hand, the Court orders Medigus to promptly and clearly disclose its position on the impact of the "correction" by providing fulsome responses to EndoChoice's RFAs and interrogatory No. 5, EndoChoice will be able to directly address Medigus' position in its opening claim construction brief so that this central issue may be thoroughly briefed and addressed for the Court.

Beyond the immediacy of the claim construction issue, Medigus' position on the impact of its CoC on the scope of the asserted claims—and the facts underpinning that position—permeate nearly every issue in this case, including infringement, invalidity, inequitable conduct, unclean hands, and Medigus' bad faith assertion of the patent in suit. Medigus should not be permitted to avoid the issue by denying EndoChoice highly relevant fact discovery to which it is entitled.

FRCP 36 (a) provides in relevant part, "Scope. A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to: (A) *facts, the application of law to fact, or opinions about either*." EndoChoice's requests fit squarely within this permissible subject matter and fulfill the purpose of Rule 26, which is to streamline issues and narrow the facts in dispute for trial. In submitting the Petition for CoC on June 11, 2013, Medigus' patent attorney represented to the Patent Office: "This proposed amendment does not contain new matter since the proposed amendment requires no new language and ***does not appear to alter the breadth and scope of the claimed invention*** since it appears obvious that the articulation section must be attached to the shaft, and not the sheath." [Ex. 4 MedigusDE0000761-762 at 762 (emphasis added)]. EndoChoice's requests merely ask Medigus to embrace or reject the factual representations made to the United States Patent and Trademark Office by its own patent attorney in requesting the "correction." While it is true that Medigus' responses to these requests may have an impact on claim construction, infringement, invalidity of the asserted claims, invalidity of the CoC, inequitable conduct, unclean hands, and EndoChoice's bad faith patent assertion counterclaim, the requests themselves are not seeking expert opinion, claim construction, or pure legal conclusions as Medigus contends.



To the extent the Court accepts Medigus' position that EndoChoice's requests rely on claim construction, legal conclusions, or expert opinions, the inquiry should not end there. "*Markman* should not be used as an excuse to evade the responsibility to fully and fairly respond to requests for admission, using qualifications as necessary, rather than seeking 'to evade disclosure by quibbling and objection.'" *Keithley v. The Home Store.com, Inc*., 2008 WL 2024977, at *3 (N.D. Cal. May 8, 2008) (quoting *Marchaud v. Mercy Medical Center*, 22 F.3d 933, 938 (9th Cir. 1994)). Instead, because Medigus has now taken a position on the meaning of the claim limitation "sheath" (a "rigid, semi-rigid or flexible outer covering") and presumably has a corresponding position on the meaning of the claim limitation "shaft," Medigus should be ordered to respond promptly to EndoChoice's requests for admission based on those positions. [Ex. 5 (July 1, 2016 letter re claim limitations)]

Finally, and for the same reasons, Medigus should be ordered to provide a fulsome response to EndoChoice's interrogatory No. 5, which seeks an explanation of the facts underlying the filing of the CoC, including how the correction made to claim 1 did not alter the breadth and scope of the claimed invention. [Ex. 6 (Medigus Response to EndoChoice's First Set of Interrogatories)].

**<u>Medigus Refuses to Provide Responses to Interrogatories Nos. 8-16</u>**

The second dispute involves Medigus' refusal to provide substantive responses to EndoChoice's interrogatory Nos. 8-16. EndoChoice propounded interrogatory Nos. 1-15 to Medigus on January 25, 2016. [Ex. 2] On February 29, Medigus objected to interrogatory Nos. 1-5 on the ground that they contained multiple discrete subparts, provided cursory responses to interrogatories 1-7[1] and refused to provide any responses to interrogatories 8-15 on the ground that they "exceed[] the maximum number of interrogatories permitted under Fed. R. Civ. P. 33 and the Scheduling Order of the Court." [Ex. 6] Ironically, on the same day that it responded and objected to EndoChoice's interrogatories, Medigus served its own first set of interrogatories, each of which contained the same type of inquiry that Medigus objected to as discrete subparts when propounded by EndoChoice. [Ex. 7] EndoChoice, nonetheless, provided a fulsome response to Medigus' interrogatories to properly comply with its discovery obligations. [Ex. 8] EndoChoice propounded an additional interrogatory No. 16 on February 26. On March 30, Medigus refused to provide a response, again contending that EndoChoice had exceeded the maximum number of interrogatories under Rule 33. [Ex. 9]

In an effort to avoid becoming mired in a dispute that would further delay discovery, EndoChoice served Medigus with revised interrogatories that were identical to its original interrogatories but deleted the portions that Medigus alleged to be discrete subparts. [Exs. 10, 11.] A comparison of the original and revised interrogatories is provided in Appendix A. To further address Medigus' complaints, EndoChoice split two of its original interrogatories into separate interrogatories (original interrogatory No. 2 became revised interrogatories Nos. 2-3, and original interrogatory No. 16 became revised interrogatory nos. 17-19) (denoted with blue and green text in Appendix A). Despite these efforts, Medigus still refused to respond to EndoChoice's interrogatories. In fact, Medigus

---

[1] While EndoChoice believes Medigus' responses to interrogatory nos. 1-7 are deficient and that such deficiencies may ultimately need to be addressed by the Court, those deficiencies (with the exception of interrogatory No. 5, which is addressed in the first section of this letter) are being addressed through the meet and confer process and are not yet ripe for the Court's consideration.

3



took the position that EndoChoice's revised interrogatories should be counted in *addition* to, rather than replacements of, its original interrogatories. [Exs. 12, 13.]

Parties should, and frequently do, modify interrogatories to informally resolve disputes over breadth, precision, and use of subparts. Medigus appears to acknowledges as much in its own interrogatories, which instruct that "[f]or any interrogatory to which EndoChoice intends to object in whole or in part as overbroad, vague or unduly burdensome, EndoChoice is directed to have a meet and confer session prior to stating such objections in an effort to give Medigus an opportunity to clarify or narrow the interrogatory and obtain a substantive response without a need for court intervention." [Ex. 7 at p. 4] EndoChoice had hoped its approach would avoid the need for the Court to engage in a dispute over subparts. Unfortunately, that effort failed.

In assessing whether participial phrases of an interrogatory are "discrete subparts," courts have instructed against taking a draconian approach and have "instead attempted to formulate more conceptual approaches, asking whether one question is subsumed and related to another or whether each question can stand alone and be answered irrespective of the answer to the others." *Banks v. Office of the Senate Sergeant-at-Arms*, 222 F.R.D. 7, 10 (D.D.C. 2004) (citing *Kendall v. GES Exposition Services,* 174 F.R.D. 684 (D. Nev. 1997)). Even the case law Medigus identified to EndoChoice in support of its position explains that "[d]etermining whether an interrogatory counts as a separate question requires a pragmatic approach." *Waterbury v. Scribner*, 2008 WL 2018432, at *2 (E.D. Cal. May 8, 2008). Subparts requesting annual tallies of events and details about those events over multiple years, for example, have been found to constitute a single interrogatory where such subparts are "logically and factually subsumed within and necessarily related to the primary question." *Thomas v. Yates*, 2009 WL 3273280, at *2-3 (E.D. Cal. Oct. 9, 2009) (counting interrogatory 2, which contained subparts (a)(i) through (a)(iii), as a single interrogatory because "the answer to the first portion of Interrogatory No. 2 is simply the sum of the answers to each of the inquiries contained in subpart (a).").

Attached Appendix A shows that what Medigus contends are discrete interrogatory subparts are actually subsidiary to the primary call of the interrogatory and provide only exemplary aspects of a fulsome response. For example, Interrogatory Nos. 1 and 3 seek a description of Medigus' development efforts. The participial parts ask when development started and when the invention was made, tested, and used. These are not discrete subparts; they are simply guidance as to the categories of information EndoChoice is seeking through the primary call of the interrogatory. *See New Park Ent. LLC v. Elec. Factory Concerts, Inc.*, 2000 WL62315 at *4 (E.D. Pa 2000) ("The court does not view subsidiary instructions to the interrogatories as propounding additional interrogatories, but merely specifying to the defendants the type of information plaintiff is eliciting in the interrogatories. Defendants' Rule 33(a) objection is therefore overruled.").

Accordingly, EndoChoice respectfully requests that the Court order Medigus to promptly answer EndoChoice's original interrogatory Nos. 8-16. Alternatively, EndoChoice requests that Medigus be ordered to answer revised interrogatory Nos. 9-19, which are substantively identical to original interrogatory nos. 8-16 but exclude the participial phrases that provide guidance as to the types of information being elicited in the primary call of the interrogatory.



Respectfully Submitted,

/s/ Susan Morrison Coletti

Susan Morrison Coletti (# 4690)

SMC/bar

cc:    Clerk of Court
       All Counsel of Record – by electronic email

5

**Appendix A. Comparison of EndoChoice Original Interrogatory Nos. 1-16
to Revised Interrogatory Nos. 1-19**

| ORIGINAL | REVISED | SUBSTANTIVE COMPONENT OF MEDIGUS RESPONSE TO ORIGINAL |
|---|---|---|
| 1. Describe in detail the development efforts that Relate to the Alleged Medigus Inventions, Including: (a) the date on which each Alleged Medigus Invention was first described in writing; (b) the date on which each Alleged Medigus Invention was first manufactured; (c) the date on which each Alleged Medigus Invention was first tested; and (d) the date on which each Alleged Medigus Invention was first used to perform a medical procedure in: (1) an animal, (2) a human cadaver, and (3) a live human patient. | 1. Describe in detail the development efforts that Relate to the Alleged Medigus Inventions. | (a) Medigus will produce relevant, non-privileged documents responsive to this interrogatory pursuant Federal Rule of Civil Procedure 33(d). (b) No commercially-released product manufactured by Medigus embodies any claim of the '871 Patent, but Medigus is still investigating non-commercial products. (c) No commercially-released product made by Medigus that embodies any claim of the '871 Patent has been tested by Medigus, but Medigus is still investigating noncommercial products. (d) No commercially-released product made by Medigus that embodies any claim of the '871 Patent has been used by Medigus to perform a medical procedure on an animal, a human cadaver, or a live human patient, but Medigus is still investigating noncommercial products. |

**Appendix A. Comparison of Original Interrogatory Nos. 1-16
to Revised Interrogatory Nos. 1-19**

| | | |
|---|---|---|
| 2. <span style="color:red">Identify all Alleged Medigus Embodying Products (by product name, project name, internal code name, model designation, product number, part number, trademark or trade name, and any other unique designation or identifier)</span>, and <span style="color:blue">for each such Alleged Medigus Embodying Product: (i) state which claim(s) of the '871 Patent is embodied by each such product; (ii) explain, using a claim chart or equivalently detailed method, specifically how each such product meets each limitation of each claim;</span> (iii) identify the person or persons most knowledgeable about the structure and function of each such product; and (iv) state the date when Medigus first began making, using, selling, and/or offering for sale of each such product. | 2. Identify all Alleged Medigus Embodying Products (by product name, project name, internal code name, model designation, product number, part number, trademark or trade name, and any other unique designation or identifier).<br><br>3. For each Alleged Medigus Embodying Product identified in the response to Revised Interrogatory No. 2, state which claim(s) of the '871 Patent is embodied by each such product and explain, using a claim chart or equivalently detailed method, specifically how each such product meets each limitation of each claim. | (i) No commercially-released product made by Medigus embodies any claim of the '871 Patent.<br>(ii) No commercially-released product made by Medigus embodies any claim of the '871 Patent.<br>(iii) No commercially-released product made by Medigus embodies any claim of the '871 Patent.<br>(iv) No commercially-released product made by Medigus embodies any claim of the '871 Patent. |
| 3. <span style="color:red">Describe in detail the development efforts that Relate to any and all Alleged Medigus Embodying Products</span>, Including: (a) the date on which each Alleged Medigus Embodying Product was first described in writing; (b) the date on which each Alleged Medigus Embodying Product was first manufactured; (c) the date on which each Alleged Medigus Embodying Product was first tested; and (d) the date on which each Alleged Medigus Embodying Product was first used to perform a medical procedure in: (1) an animal, (2) a human cadaver, and (3) alive human patient. | 4. Describe in detail the development efforts that Relate to any and all Alleged Medigus Embodying Products. | (a) No commercially-released product made by Medigus embodies any claim of the '871 Patent.<br>(b) No commercially-released product made by Medigus embodies any claim of the '871 Patent.<br>(c) No commercially-released product made by Medigus embodies any claim of the '871 Patent.<br>(d) No commercially-released product made by Medigus embodies any claim of the '871 Patent. |
| 4. <span style="color:red">For each claim of the '871 Patent that Medigus contends is infringed by an Accused EndoChoice Product, describe the efforts and acts by those involved to conceive of, reduce to practice, and diligently reduce to practice each claim</span>, Including: | 5. For each claim of the '871 Patent that Medigus contends is infringed by an Accused EndoChoice Product, describe the efforts and acts by those involved to conceive of, reduce to practice, and diligently reduce to practice each claim. | (i) Medigus will produce relevant, non-privileged documents responsive to this interrogatory pursuant Federal Rule of Civil Procedure 33(d).<br>(ii) The claims of the '871 patent were invented by the named inventors. Medigus does not currently have further information responsive to |

**Appendix A. Comparison of Original Interrogatory Nos. 1-16
to Revised Interrogatory Nos. 1-19**

| | | |
|---|---|---|
| (i) stating the dates of conception and reduction to practice for each claim; (ii) identifying each person who conceived of each claim; (iii) identifying each person who actually (as opposed to constructively) reduced each claim to practice; and (iv) identifying all Documents that evidence the alleged conception, reduction to practice, and diligence in reducing to practice each claim. | | this subpart of this interrogatory. However, Medgius' investigation is still ongoing, and Medigus will supplement if responsive information and/or documents are located. <br> (iii) Medigus is still investigating whether the '871 Patent was actually reduced to practice prior to its constructive reduction to practice. If actual reduction to practice occurred prior its constructive reduction to practice, Medigus will produce relevant, non-privileged documents responsive to this interrogatory pursuant Federal Rule of Civil Procedure 33(d). <br> (iv) Medigus will produce relevant, non-privileged documents responsive to this interrogatory pursuant to Federal Rule of Civil Procedure 33(d). |
| 5. Explain in detail the facts and circumstances surrounding Medigus' Petition for Certificate of Correction, Including (i) when and how Medigus came to believe "that the examiner at the USPTO and the Applicant made a mutual clerical error by not amending 'distal end of said sheath' to --distal end of said shaft-- when it added 'a single continuous shaft including' phrase to claim 1 to obtain the allowance [of the '871 Patent]"; (ii) why Medigus did not recognize the supposed mutual clerical error (identified in the Petition for Certificate of Correction filed for the '871 Patent) at any time in: <br> a. 2005 <br> b. 2006 <br> c. 2007 <br> d. 2008 <br> e. 2009 <br> f. 2010 <br> g. 2011 | 6. Explain in detail the facts and circumstances surrounding Medigus' Petition for Certificate of Correction. | (i) Elazar Sonnenschein discovered the error upon review of the claims of his patent on or around June 2013. <br> (ii) <br> (a) The error was not discovered in 2005 because the event described in subpart (i) had yet to occur. <br> (b) The error was not discovered in 2006 because the event described in subpart (i) had yet to occur. <br> (c) The error was not discovered in 2007 because the event described in subpart (i) had yet to occur. <br> (d) The error was not discovered in 2008 because the event described in subpart (i) had yet to occur. <br> (e) The error was not discovered in 2009 because the event described in subpart (i) had yet to occur. <br> (f) The error was not discovered in 2010 because the event described in subpart (i) had yet to occur. <br> (g) The error was not discovered in 2011 because the event described in subpart (i) had yet to occur. <br> (h) The error was not discovered in 2012 because the event described in subpart (i) had yet to occur. <br> (iii) Medigus objects to subpart (iii) as premature insofar as it seeks Medigus' claim construction of |

**Appendix A. Comparison of Original Interrogatory Nos. 1-16
to Revised Interrogatory Nos. 1-19**

| | | |
|---|---|---|
| h. 2012; (iii) how the supposed mutual clerical error (identified in the Petition for Certificate of Correction filed for the '871 Patent) is confirmed when the specification of the '871 Patent is evaluated; (iv) how the correction made to claim 1 of the '871 Patent does not alter the breadth and scope of the claimed invention; and (v) the identity of each person who participated in any significant way (e.g., providing technical input, reviewing or commenting on communications to or from the USPTO, preparing and filing papers in the USPTO) in the preparation and/or prosecution of the Petition for Certificate of Correction filed for the '871 Patent | | the '871 Patent and calling for legal conclusions and expert testimony. (iv) Medigus objects to subpart (iv) as premature insofar as it seeks Medigus' claim construction of the '871 Patent and calling for legal conclusions and expert testimony. (v) Kevin McCarthy, Kfir Luzzatto and Elazar Sonnenschien may have participated in the prosecution of the certificate of correction for the '871 Patent. |
| 6. For each claim of the '871 Patent that Medigus contends is infringed by an Accused EndoChoice Product, describe the factual and legal bases to support such contention, Including (a) identifying each claim of the '871 Patent that Medigus contends EndoChoice has infringed, indicating whether the purported infringement is direct, induced or contributory; (b) stating whether Medigus contends the identified claims are infringed literally or under the doctrine of equivalents and describe the factual and legal bases for such contention; (c) providing a claim chart that compares each Accused EndoChoice Product to each and every limitation of each allegedly infringed claim and providing Medigus' proposed construction for each limitation Medigus contends should not be afforded its plain meaning; and (d) identifying any Document that Medigus contends | 7. For each claim of the '871 Patent that Medigus contends is infringed by an Accused EndoChoice Product, describe the factual and legal bases to support such contention, Including (a) identifying each claim of the '871 Patent that Medigus contends EndoChoice has infringed, indicating whether the purported infringement is direct, induced or contributory; (b) stating whether Medigus contends the identified claims are infringed literally or under the doctrine of equivalents and describe the factual and legal bases for such contention; (c) providing a claim chart that compares each Accused EndoChoice Product to each and every limitation of each allegedly infringed claim and providing Medigus' proposed construction for each limitation Medigus contends should not be afforded its plain meaning; and (d) identifying any Document that Medigus | Medigus incorporates by reference Plaintiff and Counterclaim-Defendants' Initial Disclosures Under Section 4(c) of the Delaware Default Standard for Discovery, served February 25, 2016. |

**Appendix A. Comparison of Original Interrogatory Nos. 1-16
to Revised Interrogatory Nos. 1-19**

| | | |
|---|---|---|
| supports any contentions described in its answer to this Interrogatory. | contends supports any contentions described in its answer to this Interrogatory. | |
| 7.  Describe the legal and factual bases for Medigus' contention that EndoChoice has willfully infringed the '871 Patent, Including identifying all Documents and facts that Medigus contends supports its contention and identifying the three individuals most knowledgeable about such contentions. | 8.  Describe the legal and factual bases for Medigus' contention that EndoChoice has willfully infringed the '871 Patent. | EndoChoice and its officers had specific knowledge about the '871 Patent and EndoChoice's infringement thereof for years prior to the Present Litigation, and despite the objectively high likelihood EndoChoice's product would infringe the '871 Patent, EndoChoice proceeded to make, use, sell, and offer for sale its infringing FUSE product in the United States. Mr. Elazar Sonnenschein orally communicated to EndoChoice employees that they infringed the patent and written correspondence was provided to EndoChoice advising them of their infringement. At least Ari Levy of EndoChoice was directly informed of EndoChoice's infringement by Mr. Elazar Sonnenschein before the year 2013. At least Douglas Ladd and Yoram Ashery of EndoChoice were directly informed of EndoChoice's infringement by Mr. Elazar Sonnenschein during the years 2013 and/or 2014. Additionally, EndoChoice personnel and officers were informed of EndoChoice's infringement during DDW 2013 and the 2014 JP Morgan Annual Healthcare Conference. Furthermore, EndoChoice had actual notice of the '871 Patent prior to the filing of the Complaint as detailed in the Complaint. Medigus will produce relevant, non-privileged documents responsive to this interrogatory pursuant Federal Rule of Civil Procedure 33(d). |
| 8.  Describe in detail any joint development or other collaborative efforts between Medigus (Including by any Medigus employee, agent, consultant or representative) and Peer Medical Ltd. (Including by any Peer Medical employee, agent, consultant or representative) Relating to any | 9.  Describe in detail any joint development or other collaborative efforts between Medigus (Including by any Medigus employee, agent, consultant or representative) and Peer Medical Ltd. (Including by any Peer Medical employee, | None. |

**Appendix A. Comparison of Original Interrogatory Nos. 1-16 to Revised Interrogatory Nos. 1-19**

| | | |
|---|---|---|
| endoscopy product and identify all Documents Relating to such efforts. | agent, consultant or representative) Relating to any endoscopy product. | |
| 9. Describe in detail when and how Medigus first: (1) became aware of each Accused EndoChoice Product and (2) concluded that each Accused EndoChoice Product infringed a claim of the '871 Patent, Including identifying all Documents Relating to such facts and identifying the three individuals most knowledgeable about such facts. | 10. Describe in detail when and how Medigus first became aware of each Accused EndoChoice Product and concluded that each Accused EndoChoice Product infringed a claim of the '871 Patent. | None. |
| 10. For each asserted claim of the '871 Patent, identify and explain each and every advantage of the claimed endoscope over endoscopes described by the Prior Art and each and every problem Medigus contends is solved by the claimed endoscope. | 11. For each asserted claim of the '871 Patent, identify and explain each and every advantage of the claimed endoscope over endoscopes described by the Prior Art and each and every problem Medigus contends is solved by the claimed endoscope. | None. |
| 11. Describe in detail Medigus' corporate structure, Including identifying the relationship between Medigus and each of its predecessors, subsidiaries, successors, parents, assigns and affiliates, identifying the officers, directors, board members of each, and describing the ownership interest of Medigus in each. | 12. Describe in detail Medigus' corporate structure. | None. |
| 12. Describe in detail any secondary consideration of non-obviousness Medigus contends exists for each asserted claim of the '871 Patent, Including: (i) any long felt but unresolved need for the claimed invention, Including who felt the need and when; (ii) any failure of another to develop the claimed invention, Including who attempted but failed to develop the invention and when; (iii) any | 13. Describe in detail any and all secondary consideration of non-obviousness Medigus contends exists for each asserted claim of the '871 Patent. | None. |

**Appendix A. Comparison of Original Interrogatory Nos. 1-16
to Revised Interrogatory Nos. 1-19**

| | | |
|---|---|---|
| commercial success attributable to the claimed invention, Including any licenses to the patent; (iv) any evidence of copying of the claimed invention, Including all persons having knowledge of the alleged copying; (v) whether the claimed invention received any awards or praise in the industry; (vi) any evidence of teaching away from the claimed invention by others; and (vii) any other secondary considerations of non-obviousness on which Medigus intends to rely, and identify all Documents that Medigus contends support its contention and identify the three individuals most knowledgeable about such contentions. | | |
| 13.  State whether Medigus is seeking a reasonable royalty, lost profits, or both from EndoChoice for the alleged infringement of the asserted claims of the '871 Patent and provide a detailed explanation of the basis for all damages and other monetary remedies that Medigus is seeking in the Present Litigation, Including (1) the royalty rate and base that Medigus contends is applicable for EndoChoice's alleged use of the '871 Patent and the factual and legal bases for such contentions; and (2) if Medigus alleges lost profits, the amount of such lost profits, the legal and factual bases therefore, Including the profits per unit, costs per unit, allocation of fixed costs compared to variable costs per unit, allocation of overhead, and whether You contend that any other products' sales are convoyed with Medigus' products. | 14.  State whether Medigus is seeking a reasonable royalty, lost profits, or both from EndoChoice for the alleged infringement of the asserted claims of the '871 Patent and provide a detailed explanation of the basis for all damages and other monetary remedies that Medigus is seeking in the Present Litigation. | None. |
| 14.  Identify all licenses, offers to license, and requests to license any Medigus endoscopy | 15.  Describe in detail all licenses, offers to license, and requests to license any Medigus | None. |

**Appendix A. Comparison of Original Interrogatory Nos. 1-16
to Revised Interrogatory Nos. 1-19**

| | | |
|---|---|---|
| product, the date of the offer or request to license, whether the offer or request was accepted or rejected, the date of execution of the license, the terms of the license, and the amount of any royalties or other payments offered, requested and/or agreed upon in connection with any licensing negotiation and/or agreement. | endoscopy product including the date of the offer or request to license, whether the offer or request was accepted or rejected, the date of execution of the license, the terms of the license, and the amount of any royalties or other payments offered, requested and/or agreed upon in connection with any licensing negotiation and/or agreement. | |
| 15. Identify all Persons who have invested more than $100,000 in Medigus or who currently own more than 1% of Medigus' outstanding common stock. | 16. Identify all Persons who have invested more than $100,000 in Medigus or who currently own more than 1% of Medigus' outstanding common stock. | None. |
| 16. For each product, project, or prototype that Medigus has developed since 2000 that is intended for use or used by physicians in the diagnosis or treatment of any gastro-intestinal conditions, Including inspection of the gastro-intestinal tract, detection of polyps, diagnosis and/or treatment of GERD, or use in gastric surgery: (a) provide all names, model numbers and internal names or codes used to identify the product, project, or prototype; (b) identify all substantive changes made to each such product, project or prototype from the time it was first developed until the latter of the present or the time it was discontinued; (c) identify any patents that cover any version of each such product, project, or prototype; (d) identify any such product, project, or prototype that was marked with the '871 Patent number, and (e) identify all Documents Relating to Your response to this interrogatory. | 17. For each product, project, or prototype that Medigus has developed since 2000 that is intended for use or used by physicians in the diagnosis or treatment of any gastro-intestinal conditions, Including inspection of the gastro-intestinal tract, detection of polyps, diagnosis and/or treatment of GERD, or use in gastric surgery, provide all names, model numbers and internal names or codes used to identify the product, project, or prototype.<br><br>18. For each product, project, or prototype identified in response to Revised Interrogatory No. 17, identify all substantive changes made to each such product, project or prototype from the time it was first developed until the latter of the present or the time it was discontinued.<br><br>19. For each product, project, or prototype identified in response to Revised Interrogatory No. 17, identify any patents that cover any version of | None. |

**Appendix A. Comparison of Original Interrogatory Nos. 1-16
to Revised Interrogatory Nos. 1-19**

|  | each such product, project, or prototype and indicate whether each product, project, or prototype was marked with the '871 Patent number. |  |
|---|---|---|